**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE<br>430 South Capitol Street SE<br>Washington, D.C. 20003,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF DEFENSE<br>1000 Defense Pentagon<br>Washington, D.C. 20301,<br><br>and<br><br>OFFICE OF MANAGEMENT AND BUDGET<br>725 17th Street NW<br>Washington, D.C. 20502,<br><br>Defendants. | Civil Action No. 1:26-cv-3431 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The Democratic National Committee (DNC), plaintiff herein, alleges:

1. The U.S. Department of Defense (DOD) has proclaimed a transparently false "emergency" to alter voter-registration materials without notice and comment in an effort to disenfranchise eligible American citizens. The Office of Management and Budget (OMB) allowed these changes to go forward on an emergency basis, bypassing requisite public notice. These arbitrary and capricious actions violate the Administrative Procedure Act (APA).

2. The Federal Voting Assistance Program (FVAP) is a non-partisan program administered by DOD that, in partnership with all 50 states, U.S. territories, and the District of Columbia, helps U.S. citizens abroad exercise their fundamental right to vote. For decades, FVAP has designed the Federal Post Card Application (FPCA), which members of the uniformed military and Americans abroad use to register to vote and request mail ballots.

3. Among the eligible voters who depend on the FPCA are U.S. citizens born and remaining abroad. These American citizens pay U.S. federal and state taxes, but now a years-old plan has culminated in a manufactured "emergency" to justify impeding their right to vote in American elections and potentially disenfranchising them entirely.

4. In 2024, the Republican National Committee (RNC) began a state-by-state litigation campaign to invalidate state laws authorizing U.S. citizens born and remaining abroad to vote, based on purported conflicts with state constitutions. In these suits, the RNC specifically alleged that these so-called "never-resident voters overwhelmingly favor Democratic candidates." Rather than attempt to earn their votes, the RNC targeted their fundamental rights. But nearly all state courts have declined to find that their state legislatures violated their state constitutions.

5. Following a barrage of new RNC lawsuits in June and July, DOD declared in August that it had only recently learned that the FPCA "may confuse voters about . . . their eligibility to use [this] form[] to register" and that immediate action was needed. The proposed solution was not to clarify language or to point to state-specific guidance. Rather, DOD proposed to eliminate the box on the FPCA labeled, "I am a U.S. citizen living outside the country, and I have never lived in the United States"—which could make it impossible for U.S. citizens born and remaining abroad to use the FPCA to register in states where they are eligible to vote.

6. Two days after receiving DOD's request for emergency review, OMB opted to bypass the ordinary process for such an update and approved the emergency change, despite the manufactured emergency claim and DOD's failure to "take[] all practicable steps to consult with interested agencies and members of the public." 5 C.F.R. § 1320.13(c).

7. Following issuance of the revised FPCA, DOD pulled down online guidance for U.S. citizens born and remaining abroad, removed corresponding information from its 2026–2027

Voting Assistance Guide without noting the change, and submitted the new forms for regular OMB review, aiming to disenfranchise U.S. citizens born and remaining abroad no matter the laws of the states in which they might otherwise vote.

8. Circumstances surrounding DOD's actions suggest that DOD modified the FPCA because of the perceived political preferences of Americans citizens born and remaining abroad, in an attempt to fence out these voters from the electorate and advance the interests of the Republican Party.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331.

10. Venue is proper under 28 U.S.C. §§ 88 and 1391(e), as at least one of the Defendants' headquarters is located in Washington, D.C., within this district, and a substantial part of the events or omissions giving rise to the DNC's claim occurred here.

## PARTIES

11. The Democratic National Committee is the oldest continuing party committee in the United States and is the Democratic Party's national committee, as defined by 52 U.S.C. § 30101(14). The DNC is dedicated to electing Democratic candidates in federal, state, and local elections across the country. In support of its mission, the DNC seeks to educate registered Democratic Party members and supporters concerning the electoral process and potential impediments to voting, to encourage, assist, and protect Democratic Party members and supporters in casting ballots and having those ballots counted, and to preserve free and fair elections in the United States. DNC members include the formal membership of the DNC's decision-making bodies, registered Democrats in states with partisan voter registration, and participants in Democratic Party primaries, some of whom face material burdens on their ability to register and request mail ballots based on DOD and OMB's challenged actions and some of whom will be

disenfranchised as a result. However, neither the claims asserted nor the relief requested below require the individual participation of DNC members.

12. The U.S. Department of Defense is a federal agency headquartered in Washington, D.C. It is an agency within the meaning of the APA. 5 U.S.C. § 551(1). Executive Order No. 12,642 designated the Secretary of Defense as the Presidential Designee under 52 U.S.C. § 20301, making the Secretary responsible for implementing aspects of the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), Pub. L. No. 99-410, 100 Stat. 924 (1986) (codified as amended at 52 U.S.C. §§ 20301–20311), including prescribing the FPCA. DOD carries out its UOCAVA responsibilities through FVAP.

13. The Office of Management and Budget is an office within the Executive Office of the President of the United States. It is an agency within the meaning of the APA. 5 U.S.C. § 551(1). OMB carries out its responsibilities under the Paperwork Reduction Act (PRA), 44 U.S.C. §§ 3501–3521, through the Office of Information and Regulatory Affairs (OIRA), *id.* § 3503.

## LEGAL FRAMEWORK

### I. UOCAVA

14. UOCAVA sets federal voting-access requirements for members of the uniformed services, members of the merchant marine, their spouses and dependents, and overseas citizens.

15. UOCAVA requires the President to designate the head of an executive department to have primary responsibility for federal functions under the act. 52 U.S.C. § 20301(a).

16. UOCAVA then requires the Presidential Designee to "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States." 52 U.S.C. § 20301(b)(2). In turn, UOCAVA requires states to

"use the official post card form . . . for simultaneous voter registration application and absentee ballot application." *Id.* § 20302(4).

## II. APA

17. The APA establishes a fair and uniform framework for federal agency rulemaking and adjudication, ensures public participation, and guarantees broad judicial review of final agency action. *See* 5 U.S.C. §§ 551–559, 701–706.

18. The APA permits judicial review of any final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704.

19. The APA then authorizes courts to hold unlawful and set aside agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## III. PRA

20. The PRA, 44 U.S.C. §§ 3501–3521, governs the manner in which agencies collect information from the public.

21. The PRA aims to strengthen the partnership between the federal, state, and local governments by maximizing the utility of information created, collected, maintained, used, disseminated, or maintained. *See id.* § 3501(6).

22. OMB has a statutory duty to review any proposed "collection[] of information" in an information collection request (ICR) to ensure compliance with the PRA. 44 U.S.C. § 3504(c).

23. Under the PRA, "collection of information" generally encompasses any agency request or demand for information from the public that is addressed to ten or more persons in a twelve-month period. 44 U.S.C. § 3502(3); *see also* 5 C.F.R. § 1320.3(c) (detailed definition).

24. Agencies must comply with the PRA regardless of whether the collection of information is "mandatory, voluntary or required to obtain or retain a benefit." 5 C.F.R. § 1320.3(c).

25. The PRA bars agencies from conducting or sponsoring the collection of information without first meeting procedural requirements. Before OMB may even consider an ICR, an agency must follow a complex statutory procedure. *See* 44 U.S.C. § 3507(a)(1).

26. The agency must conduct a review for numerous statutory factors concerning need, burden, and efficient use. *See id.* § 3507(a)(1)(A); *see also id.* § 3506(c)(1) (specifying factors).

27. The agency must evaluate public comments received during a sixty-day period following notice in the Federal Register and otherwise consult with members of the public and affected agencies. *See id.* § 3507(a)(1)(B); *see also id.* § 3506(c)(2) (establishing notice-and-comment requirements).

28. The agency must certify to OMB that the proposed collection of information meets statutory factors concerning need, burden, and efficient use and provide the proposed collection of information and related materials to OMB. *See id.* § 3507(a)(1)(C); *see also id.* § 3506(c)(3) (certification requirements).

29. The agency must publish the submission to OMB in the Federal Register. *See id.* § 3507(a)(1)(D).

30. Typically, OMB must provide an additional thirty days for public comment prior to making a determination on an ICR and must notify the agency of the decision to approve or disapprove an ICR not contained in a proposed rule within sixty days after the submission's receipt or publication in the Federal Register, whichever is later. 44 U.S.C. § 3507(b)–(c).

31. The collection of information may not proceed absent OMB's express or inferred approval of the ICR. *See id.* § 3507(a)(2).

32. Following approval, OMB must assign a control number to be displayed on the collection of information. *See* 44 U.S.C. § 3507(a)(3)

33. OMB is required to determine whether a collection of information by the agency "is necessary for the proper performance of the functions of the agency" before approving a proposed collection of information. 44 U.S.C. § 3508. "To the extent, if any, that [OMB] determines that the collection of information by an agency is unnecessary for any reason, the agency may not engage in the collection of information." *Id.*

34. The PRA establishes an "emergency processing" regime for a collection of information too urgent to meet ordinary requirements. 5 C.F.R. § 1320.13. For an ICR to be eligible for emergency processing, an agency must determine that the collection of information "is needed prior to the expiration" of the current collection and "essential to the mission of the agency." 44 U.S.C. § 3507(j)(1)(A); 5 C.F.R. § 1320.13(a)(1). Further, the agency must determine that it "cannot reasonably comply" with PRA requirements because "public harm is reasonably likely to result if normal clearance procedures are followed[,] an unanticipated event has occurred[,] or the use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information or is reasonably likely to cause a statutory or court ordered deadline to be missed." 44 U.S.C. § 3507(j)(1)(B); 5 C.F.R. § 1320.13(a)(2).

35. Even during "emergency processing," an agency must "submit information indicating that it has taken all practicable steps to consult with interested agencies and members of the public in order to minimize the burden of the collection of information." 5 C.F.R.

§ 1320.13(c). The agency must also publish a notice of the request for emergency processing in the Federal Register, including the time period requested for OMB consideration. *Id.* § 1320.13(d).

36. PRA "emergency processing" is intended to be a rare procedure, "to be employed by agencies only in an unusual and emergency situation where an unforeseen event or public harm is a consideration." S. Rep. No. 96-930, at 26–27 (1980); *see, e.g., A Guide to the Paperwork Reduction Act*, Digital.gov (Aug. 2026), https://perma.cc/YGB9-V37R (describing emergency clearance as "used in very limited cases").

37. OMB maintains the authority to disapprove an ICR submitted for emergency processing, for failure to meet either general PRA standards or emergency processing requirements. *See* 44 U.S.C. § 30507(e)(1); 5 C.F.R. § 1320.13(e).

## ALLEGATIONS

### I. UOCAVA and the Federal Post Card Application

38. Congress enacted UOCAVA in 1986.

39. As noted above, UOCAVA requires the President to designate the head of an executive department to have primary responsibility for federal functions under the Act. 52 U.S.C. § 20301(a); *see supra* ¶ 15. In 1988, President Ronald Reagan named the Secretary of Defense as the Presidential Designee. *See* Exec. Order No. 12,642, 53 Fed. Reg. 21,975 (June 8, 1988).

40. UOCAVA requires the Presidential Designee to "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application, for use by the States." 52 U.S.C. § 20301(b)(2).

41. UOCAVA does not dictate the exact text and layout of the FPCA, unlike earlier statutes. *See id.*; *cf.* Federal Voting Assistance Act of 1955, Pub. L. No. 94-296, § 204, 69 Stat. 584, 586–88; Soldier Voting Act of 1942, Pub. L. No. 77-712, § 3, 56 Stat. 573, 573–74.

42. UOCAVA does not limit use of the FCPA to "absent uniformed services voters" and "overseas voters," which are defined groups under the act. *See* 52 U.S.C. § 20301(b)(2); *see also id.* § 20310(5), (7) (defining terms); *cf. id.* § 20301(b)(3) (requiring creation of federal write-in absentee ballot "for absentee uniformed services voters and overseas voters").

43. UOCAVA's open-ended mandate was a departure from limited use of the postcard application under prior statutes. *See* Federal Voting Assistance Act of 1955, Pub. L. No. 94-296, § 102(1), 69 Stat. at 584 (authorizing post-card application for use by specified groups of U.S. citizens); *id.* § 204(b); Soldier Voting Act of 1942, Pub. L. No. 77-712, § 3, 56 Stat. at 753 (authorizing post-card application for use by any "member of the land or naval forces of the United States absent from the place of his residence").

44. Since at least 2005, the FPCA has laid out open-ended categories that any U.S. citizen abroad could use to accurately state their residency status.

45. The 2005 FPCA contained two checkboxes for civilians abroad, allowing applicants to say they were "a U.S. citizen residing outside the U.S. temporarily" or "a U.S. citizen residing outside the U.S. indefinitely."

46. The 2011 FPCA contained three checkboxes for civilians abroad, allowing applicants to say, "I am a U.S. citizen residing outside the U.S., and I intend to return"; "I am a U.S. citizen residing outside the U.S., and I do not intend to return"; or "I am a U.S. citizen otherwise granted military/overseas voting rights under State law." Next to the third option, the 2011 FPCA advised "(check the Voting Assistance Guide)."

47. The 2013 FPCA updated the text of the checkboxes for civilians abroad, allowing applicants to say, "I am a U.S. citizen residing outside the U.S., and I intend to return"; "I am a

U.S. citizen residing outside the U.S., and my return is not certain"; or "I am a U.S. citizen and have never resided in the United States."

48. The 2017 FPCA once again updated the text of the checkboxes for civilians abroad, allowing applicants to say, "I am a U.S. citizen residing outside the country, and I intend to return"; "I am a U.S. citizen residing outside the country, and my return is uncertain"; or "I am a U.S. citizen residing outside the country, and I have never lived in the United States."

49. The 2019 FPCA made changes to checkboxes for servicemembers but did not change the three checkboxes for civilians abroad.

50. The 2021 FPCA made only a slight change to the text of the checkboxes for civilians abroad. This revision adjusted the third checkbox from "I am a U.S. citizen residing outside the country, and I have never lived in the United States" to "I am a U.S. citizen residing outside the country, I have never lived in the United States."

51. The 2023 FPCA left the text of the checkboxes for civilians abroad unchanged.

## II. U.S. Citizens Born and Remaining Abroad

52. For at least twenty years, U.S. citizens born and remaining abroad have been a small segment of the overseas population that uses the FPCA to register to vote and request a mail ballot.

53. Many U.S. citizens born and remaining abroad are DNC members who typically vote for Democratic candidates when they are able to successfully request and cast a ballot.

54. Each state establishes its own voter qualifications for both federal and state elections, including qualifications concerning residency and domicile. *See, e.g.*, U.S. Const. art. I, § 2, cl. 1; *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 17 (2013).

55. The U.S. Constitution authorizes federal preemption of state voter qualifications only to expand the franchise, typically through legislative or judicial enforcement of the Reconstruction Amendments. *See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 335–43 (1972); *Oregon*

*v. Mitchell*, 400 U.S. 112, 126–31 (1970) (opinion of Black, J.); *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966); *Carrington v. Rash*, 380 U.S. 89, 89–97 (1965); *Harman v. Forssenius*, 380 U.S. 528 (1965).

56. UOCAVA confirms a federal right for certain U.S. citizens residing outside the United States, defined as "overseas voters," to register and vote by absentee ballot in federal elections. *See* 52 U.S.C. § 20302(a)(1) (requiring states to permit absent uniformed services voters and overseas voters to register and vote); *id.* § 20310(5) (defining "overseas voter"); *cf.* Overseas Citizens Voting Rights Act, Pub. L. No. 94-203, § 3, 89 Stat. 1142, 1142 (1976) (establishing voting rights of overseas citizens).

57. FVAP has long taken the position that U.S. citizens born and remaining abroad—also known as "never residents" or "never resided voters"—fall outside the scope of UOCAVA's federal guarantee, and so their eligibility "varies by State." *Never Resided Voters*, FVAP 6–8 (2017), https://perma.cc/PM3X-6FCT.

58. Thirty-eight states and the District of Columbia have enacted legislation to extend the right to vote to U.S. citizens born and remaining abroad. *See* Doris L. Speer et al., *Some Overseas U.S. Citizens Disenfranchised in 12 States*, Ass'n of Ams. Resident Overseas (Feb. 14, 2026), https://perma.cc/X9KS-VCJM; *see also Never Resided in the U.S.?*, FVAP, https://perma.cc/W82P-LEJP (captured May 31, 2026) (collecting state standards).

59. The Uniform Law Commission has promulgated the Uniform Military and Overseas Voters Act (UMOVA) to standardize procedures for uniformed military and overseas voters and to extend federal UOCAVA rights to state and local elections. UMOVA also authorizes Americans born and remaining abroad to vote in federal, state, and local elections.

60. Since at least 2011, FVAP has collected state-specific eligibility guidance concerning U.S. citizens born and remaining abroad, which it has published in its biennial Voting Assistance Guide. *See 2026-27 Voting Assistance Guide*, FVAP (Oct. 2025), https://perma.cc/H2QW-YKWP.

61. In 2017, FVAP responded to public guidance requests by publishing a policy brief concerning U.S. citizens born and remaining abroad. *See Never Resided Voters*, *supra*; *see also Never Resided in the U.S.?*, *supra*.

62. FVAP maintains an "Online Assistant" that U.S. citizens may use to complete the FPCA directly on the agency website. *See FVAP.gov Online Assistant: Complete the FPCA*, FVAP, https://www.fvap.gov/r3/fpca/state (last visited Sept. 29, 2026).

63. Before August 2026, the Online Assistant only provided applicants with the option to select "I am a U.S. citizen residing outside the country, I have never lived in the United States" if the applicant had already indicated that their state of voting residence was a state that allowed U.S. citizens born and remaining abroad to participate in elections.

64. As a result of the Online Assistant's automatic process, it was not possible for an U.S. citizen born and remaining abroad to complete the FPCA online and submit the application to a state where this group of U.S. citizens is not eligible to register and vote.

65. The U.S. Election Assistance Commission (EAC) publishes statistics concerning voting by U.S. citizens abroad. *See Election Administration and Voting Survey: 2024 Comprehensive Report*, EAC 193–224 (2025), https://perma.cc/TZJ5-S5FW.

66. According to the EAC, more than 800,000 overseas citizens were registered to vote during the 2024 federal election cycle. *See id.* at 211.

67. Federal election statistics do not distinguish U.S. citizens born and remaining abroad from other overseas registrants. *See id.*

68. In 2016 FVAP estimated that there "were approximately 11,590 registered US citizen voters who never resided in the U.S." *Never Resided in the U.S.?*, *supra*, at 2. Upon information and belief, the number of registered voters who are U.S. citizens born and remaining abroad has increased in subsequent election cycles.

69. U.S. citizens born and remaining abroad are subject to federal income, estate, and gift taxes and to taxation by the states. *See, e.g.*, *Publication 54: Tax Guide for U.S. Citizens and Resident Aliens Abroad*, IRS (2025), https://perma.cc/LV8W-VJ6V; *see also, e.g.*, *Residency Status*, Va. Dep't of Taxation (2026), https://perma.cc/CZS9-ZDAJ.

## III. Updating the FPCA Through Ordinary PRA Procedures

70. For decades, DOD submitted ICRs to modify the FPCA pursuant to the PRA's ordinary procedures, including full opportunities for notice and comment.

71. In the last fifteen years, DOD updated the FPCA through the PRA's standard clearance process in 2013, 2017, 2019, 2021, and 2023.

72. In 2013, 2017, 2019, 2021, and 2023, DOD and OMB received and considered comments during both the sixty-day agency notice period and the thirty-day OMB notice period before finalizing changes to the FPCA.

73. For example, in 2019, DOD received at least eighty comments during the sixty-day notice period and OMB received over twenty additional comments during the thirty-day notice period. Comments received by both DOD and OMB highlighted use of the FPCA by U.S. citizens born and remaining abroad.

74. In 2021, DOD received over 300 comments during the 60-day notice period and OMB received over 30 additional comments during the 30-day notice period. Again, both DOD and OMB received comments about use of the form by U.S. citizens born and remaining abroad.

## IV. RNC's Nationwide Campaign to Disenfranchise U.S. Citizens Born and Remaining Abroad.

75. Since 2024, the RNC has orchestrated a nationwide campaign to disenfranchise American citizens born and remaining abroad on a state-by-state basis. These challenges have been largely unsuccessful.

76. DOD's emergency changes to the FPCA target the same American citizens that the RNC has spent years seeking to fence out of the electorate.

77. The RNC has brought challenges to the voting rights of U.S. citizens born and remaining abroad in eight states: Arizona, Colorado, Michigan, Nebraska, North Carolina, Nevada, New Jersey, and Virginia. Five Republican Congressmen brought a similar suit in Pennsylvania.

78. In litigation across the country, the RNC's copycat approach has pressed the same arguments, with little attention to the specific contours of state law.

79. State courts in Michigan, Nebraska, Pennsylvania, and Virginia have rejected these challenges, and litigation in Arizona, Colorado, Nevada, and New Jersey remains pending before state trial courts.

80. Only a North Carolina court has accepted the RNC's challenge, although a federal court concluded that the state court's decision to throw out ballots already cast by U.S. citizens born and remaining abroad violated due process and was an unconstitutional burden on the right to vote. *See Griffin v. N.C. State Bd. of Elections*, 781 F. Supp. 3d 411, 444–50 (E.D.N.C. 2025).

81. After filing a half-dozen new lawsuits in June and July, the RNC announced a "nationwide effort" to disenfranchise U.S. citizens born and remaining abroad, describing laws

authorizing these Americans' participation in elections as an "extreme absentee voting loophole" and an affront to "election integrity."

82. The next month, DOD announced an emergency revision to the FPCA to preclude U.S. citizens born and remaining abroad from using the form, simply by eliminating the checkbox labeled "I am a U.S. citizen residing outside the country, I have never lived in the United States."

83. Based on the clear partisan impact of the decision, its historical background, the sequence of events leading up to the decision, substantive and procedural deviations from ordinary procedures, and contemporaneous statements in the form of the removal of neutral guidance, DOD's actions appear calculated to prevent U.S. citizens born and remaining abroad—including DNC members—from voting in states where they are eligible to cast a ballot, at least in part because of their perceived political preferences. *Cf. Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 529 U.S. 252, 266–68 (1977).

84. An attempt to fence out voters from the electorate based on their perceived political beliefs is incompatible with the First Amendment. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015) (describing actions "to subordinate adherents of one political party" as "incompatible with democratic principles" (citation modified)); *Carrington*, 380 U.S. at 94 ("'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible."); *cf. Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (striking down boundary change that "fenc[ed] [Black] citizens out of town so as to deprive them of their pre-existing municipal vote").

## V. DOD's Emergency Applications to OMB

### A. The August 13 Emergency Information Collection Request

85. On August 13, 2026, DOD sent OMB an emergency ICR seeking to amend the FPCA. Letter from Sean O'Keefe, Deputy Under Secretary of [Defense] for Personnel and

Readiness, to Dominic Mancini, Deputy Administrator of Office of Information and Regulatory Affairs (Aug. 13, 2026), https://perma.cc/Z6ET-ARF4 (Aug. 13 ICR).

86. Notice of the August 13 Emergency ICR does not appear in the Federal Register.

87. The August 13 Emergency ICR asserted, "It has recently come to our attention that the current format of th[is] form[] may confuse voters about . . . their eligibility to use th[is] form[] to register." Aug. 13 ICR at 1.

88. The assertion that DOD had only recently learned of potential incompatibility between the FPCA and voter eligibility requirements is implausible and pretextual.

89. As described above, FVAP has at least fifteen years of experience issuing guidance to U.S. citizens born and remaining abroad, reviewing public comments concerning use of the FPCA by these applicants, and modifying the FPCA to best serve these eligible voters. *See supra* ¶¶ 44-51.

90. The August 13 Emergency ICR claimed that, because the "next Federal election is fewer than 90 days away, . . . there is insufficient time to modify the FPCA . . . via the standard Paperwork Reduction Act (PRA) process." Aug. 13 ICR at 1.

91. Any FPCA already received during the calendar year, including prior to the requested modification, serves as a request for a mail ballot for all federal elections that year and will result in ballot transmittal for the November election. *See* 52 U.S.C. § 20306; *2026-27 Voting Assistance Guide*, *supra*, at 8 ("Provided under federal law, the FPCA registers you to vote and requests absentee ballots for a minimum of all federal elections in the current calendar year."); *see also* Aug. 13 ICR at 2 ("The time to apply for ballots is ongoing.").

92. As a result, neither the upcoming election nor DOD's ostensible discovery of the FPCA's purported flaws provides a valid impetus to change the FPCA just weeks before an

election. *Cf. People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sept. 25, 2026) (cautioning against federal alteration of state election rules on the eve of election); *USPS v. California*, No. 26A305, 2026 WL 2687160, at *1 (U.S. Sept. 14, 2026) (declining to stay injunction against late federal change in election procedures).

93. The August 13 Emergency ICR also claimed that public harm is reasonably likely to result if normal clearance procedures and time periods are followed. Aug. 13 ICR at 1; *see id.* at 2 ("Delay could impact voters in the upcoming federal election."). This claim is implausible and pretextual.

94. FVAP subsequently offered guidance that "States may process previous versions of the FPCA" and confirmed that, "[i]f the voter already has a previous version of the FPCA . . . on file with their election office, they do not need to submit a new form." *FVAP Update*, FVAP (Sept. 24, 2026), https://perma.cc/MKR3-Q4Y2. This guidance confirms that the upcoming election and the threat of public harm were not actual or valid bases to change the FPCA without notice and comment.

95. The August 13 Emergency ICR does not consider the impact of the abrupt change to the FPCA on Americans born and remaining abroad who rely on the FPCA to register to vote and request mail ballots.

96. The August 13 Emergency ICR does not consider the impact of an abrupt change to the FPCA on state and local election officials who rely on the FPCA to process the registrations and ballot requests of U.S. citizens born and remaining abroad who are eligible under state law.

97. In fact, many state laws incorporate the existence of the FPCA and depend on the form to be used by all eligible civilians abroad. *See, e.g.*, Colo. Rev. Stat. § 1-8.3-107(1); Mich. Comp. Laws § 168.759a(1); N.J. Stat. § 19:59-4(b).

98. The August 13 Emergency ICR proposed eliminating the third checkbox for U.S. citizens abroad, which allowed voters to state, "I am a US citizen living outside the country, I have never lived in the United States." Aug. 13 ICR at 3.

99. The August 13 Emergency ICR based this change on a purported aim "to avoid applicant confusion." *Id.*

100. The August 13 Emergency ICR then asserted that individuals "who have never resided in the United States are not within the class of voters specifically defined by UOCAVA and therefore *may* not be able to use the FPCA." *Id.* (emphasis added); *see also id* at 2 ("These amendments are necessary to eliminate voter confusion and to ensure that the FPCA . . . conform[s] to Federal law.").

101. This assertion recognizes that some civilians abroad who FVAP deems not to be "overseas voters" as defined by UOCAVA, namely U.S. citizens born and remaining abroad, nonetheless may use the FPCA to register to vote and request a mail ballot.

102. The August 13 Emergency ICR also claimed that voters "*may* be confused by the language on the form, and individuals outside of UOCAVA's scope *may* believe they are eligible to use the forms to register and vote." *Id.* at 3 (emphasis added).

103. This claim speculates about the possibility of voter confusion without evidence and without relying on public feedback from overseas voters, state and local election officials, and other users of the FPCA.

104. The August 13 Emergency ICR next indicated that the FPCA had been amended "most recently in 2019 and 2023." *Id.*

105. DOD's failure to identify the 2021 revision to the FPCA suggests that FVAP failed to review the complete administrative history of the form before proposing emergency changes.

106. The August 13 Emergency ICR asserts that "[c]larification" of the FPCA by removing the third box for civilians overseas "will ensure that State and local election officials are aware of Federal registration requirements and will facilitate compliance with Federal law." *Id.* at 3.

107. As noted above, eligibility requirements are established by state law. *See supra* ¶ 54. No state relies exclusively on federal preemption to extend the franchise to "absent uniformed service voters" and "overseas voters," as defined by UOCAVA. 52 U.S.C. § 20310(5). On the other hand, allowing U.S. citizens born and remaining abroad to register to vote and request a mail ballot in states that enfranchise these voters does not run afoul of federal law.

108. The August 13 Emergency ICR indicates that DOD's only effort at consultation "with interested agencies and members of the public," 5 C.F.R. § 1320.13(c), was to discuss this change to the FPCA with the Department of Homeland Security (DHS), *see* Aug. 13 ICR at 3.

109. DHS has no role regarding voting by U.S. citizens abroad or UOCAVA enforcement. *Cf.* 52 U.S.C. § 20307(a) (Justice Department authority).

110. The August 13 Emergency ICR requested to "bypass[]" "standard pre-clearance public comment periods" to "meet UOCAVA ballot delivery deadlines," "to provide sufficient advance guidance to the States and to voters," and "to ensure timely implementation." Aug. 13. ICR at 3.

111. Modification of the FPCA could not improve the ability of local jurisdictions to meet UOCAVA ballot "delivery deadlines." UOCAVA typically requires election officials to "transmit a validly requested absentee ballot . . . not later than 45 days before the election." 52 U.S.C. § 20302(a)(8). Moreover, as noted above, *see supra* ¶ 91, any valid FPCA received during the calendar year, including prior to the requested modification, will result in ballot transmittal for

the November election, *see* 52 U.S.C. § 20306; *see also 2026-27 Voting Assistance Guide*, *supra*, at 8 ("Provided under federal law, the FPCA registers you to vote and requests absentee ballots for a minimum of all federal elections in the current calendar year.").

112. Modification of the FPCA also did not provide "advance guidance to the states and to voters." Rather, DOD notified election officials only after changes were made. *See, e.g.*, *FVAP Update*, *supra*, at 1. Many state voter registration applications and mail ballot request forms do not contain fields needed to record an address outside of the United States, and advance guidance was needed for states to prepare forms for eligible U.S. citizens no longer able to use the FPCA.

113. The August 13 Emergency ICR requested emergency processing to ensure "timely implementation," Aug. 13 ICR at 3, but did not set out the time period within which OMB should approve or disapprove the ICR, *cf.* 5 C.F.R. § 1320.13(b) (requiring statement in any emergency processing request).

114. OMB did not approve the August 13 Emergency ICR. *See OMB Control Number History: 0704-0503*, OIRA, https://perma.cc/J84W-MMTK (captured Sept. 26, 2026).

**B. The August 26 Emergency Information Collection Request**

115. On August 26, 2026, DOD sent OIRA a second, nearly identical emergency ICR. Letter from Sean O'Keefe, Deputy Under Secretary of War for Personnel and Readiness, to Dominic Mancini, Deputy Administrator of Office of Information and Regulatory Affairs (Aug. 26, 2026), https://perma.cc/54PP-N5DB (Aug. 26 ICR).

116. Notice of the August 26 Emergency ICR does not appear in the Federal Register. *Cf.* 5 C.F.R. § 1320.13(d).

117. The August 26 Emergency ICR set out most of the same flawed bases for emergency review and modification of the FPCA contained in the August 13 ICR. *See supra* ¶¶ 87–112.

118. Following this litany of repeated justifications, the August 26 Emergency ICR added, "The elimination of this checkbox will reduce confusion and avoid the use of the form by those who are ineligible under UOCAVA." Aug. 26 ICR at 3.

119. As noted above, voters who may not fall within UOCAVA's grant of eligibility to vote in federal elections have nonetheless used the FPCA for decades to register to vote and request a mail ballot based on state eligibility criteria, and state and local election officials have relied on the availability of the FPCA to register these voters and process their mail ballot applications. *See supra* ¶¶ 52–58.

120. The August 26 Emergency ICR eliminated the prior reference to consultation between DOD and DHS. *Compare* Aug. 13 ICR at 3, *with* Aug. 26 ICR at 3. Rather, the August 26 ICR asserts that "[n]o additional steps are necessary to consult with interested parties." Aug. 26 ICR at 3.

121. The August 26 Emergency ICR also added a request for "OMB approval by August 28, 2026." Aug. 26 ICR at 3; *see also* 5 C.F.R. § 1320.13(b) (requiring emergency processing requests to include "the time period within which OMB should approve or disapprove the collection of information").

**C. OMB Approval of the August 26 Emergency Information Collection Request**

122. OMB is required to determine whether an ICR is "necessary for the proper performance of the function" of the requesting agency. 44 U.S.C. § 3508.

123. Although the FPCA itself is necessary for the proper performance of FVAP's function under UOCAVA, the August 26 Emergency ICR is not.

124. OMB's public determination does not indicate whether the August 26 Emergency ICR was "necessary for the proper performance of the function" of DOD.

125. OMB is required to determine whether an agency "has taken all practicable steps to consult with interested agencies and members of the public in order to minimize the burden of the collection of information." 5 C.F.R. § 1320.13(c).

126. DOD did not take all practicable steps to consult with interested agencies and members of the public in order to minimize the burden of the August 26 Emergency ICR.

127. OMB's public determination does not address DOD's failure to consult with interested agencies and members of the public.

128. OMB is required to determine whether an agency has "set forth in the Federal Register notice prescribed by [5 C.F.R.] § 1320.5(a)(1)(iv), unless waived or modified under this section, a statement that it is requesting emergency processing, and the time period" for approval or disapproval. 5 C.F.R. § 1320.13(d).

129. DOD did not set forth notice of the August 26 Emergency ICR and the information required under 5 C.F.R. § 1320.5(a)(1)(iv) in the Federal Register.

130. There is no indication in the public record of waiver or modification of the requirement that notice of an ICR submitted for emergency processing must still be published in the Federal Register.

131. OMB's public determination does not address DOD's failure to provide notice of the August 26 Emergency ICR in the Federal Register or any waiver or modification of the requirement.

132. DOD has previously provided notice in the Federal Register when making requests for emergency processing of an ICR. *See, e.g.*, *Implementation of Federal Acquisition Supply Chain Security Act Orders*, 88 Fed. Reg. 69,503 (Oct. 5, 2023); *Information Collection*

*Requirement*, 84 Fed. Reg. 69,362 (Dec. 18, 2019); *Information Collection*, 83 Fed. Reg. 29,117 (June 22, 2018).

133. The emergency processing request set out in the August 26 Emergency ICR was procedurally deficient under 5 C.F.R. § 1320.13.

134. Nonetheless, OMB approved the August 26 Emergency ICR on August 28, as requested, just two days after receipt. *OMB Control Number History*, *supra*; *View ICR – OIRA Conclusion: 202608-0704-009*, OIRA, https://perma.cc/FN63-CVRC (captured Sept. 26, 2026).

## VI. The Current FPCA and the Removal of Guidance for Americans Born and Remaining Abroad

135. Following approval of the August 26 Emergency ICR, the FPCA now contains only two checkboxes for civilians abroad: "I am a U.S. citizen outside the country, and I intend to return" and "I am a U.S. citizen living outside the country, and my intent to return is uncertain." *Voter Registration and Absentee Ballot Request: Federal Post Card Application (FPCA)*, FVAP (Aug. 2026), https://perma.cc/G6CQ-XFVV.

136. This change will generate substantial confusion among U.S. citizens born and remaining abroad, who have long relied on the FPCA to register to vote and request mail ballots.

137. The FPCA must be signed under penalty of perjury. *See id.*

138. The FPCA states, "Previous editions are obsolete." *Id.*

139. Notwithstanding informal guidance, *see supra* ¶ 94, U.S. citizens born and remaining abroad who complete a prior version of the FPCA that contains the now-eliminated checkbox risk having their applications denied.

140. FVAP has now taken down the webpage on which it previously provided information to U.S. citizens born and remaining abroad concerning their eligibility to participate in elections on a state-by-state basis. *Compare Never Resided in the U.S.?*, FVAP, https://

perma.cc/P67N-N9A9 (captured Sept. 25, 2026) ("This page is temporarily unavailable"), *with* FVAP, *Never Resided in the U.S.?*, *supra* (collecting state standards). This guidance had been available on FVAP's website since at least 2014. *See Never Resided in the U.S.?*, FVAP, https://web.archive.org/web/20140116012303/https://www.fvap.gov/citizen-voter/reside (captured Jan. 16, 2014).

141. FVAP has also removed information concerning the eligibility of U.S. citizens born and remaining abroad to register and vote from its 2026-2027 Voting Assistance Guide, without notice or a change in the date on the guidance. *Compare 2026-27 Voting Assistance Guide*, FVAP (Oct. 2025), https://perma.cc/8A38-NVE3 (captured Sept. 25, 2026), *with 2026-27 Voting Assistance Guide*, FVAP (Oct. 2025), https://perma.cc/H2QW-YKWP (captured May 31, 2026).

142. Without FVAP serving as an authoritative source of information concerning the eligibility of U.S. citizens born and remaining abroad, these Americans will be less likely to exercise their right to vote in jurisdictions where they are eligible to register, request mail ballots, and participate in elections.

143. DOD's actions have baselessly questioned the voting rights of U.S. citizens born and remaining abroad who meet state eligibility requirements.

144. Weeks after OMB granted DOD's August 26 Emergency ICR, DOD published a proposed public information collection in the Federal Register, initiating the sixty-day public-comment period. *See Proposed Collection*, 91 Fed. Reg. 57,576 (Sept. 10, 2026). That comment period ends on November 9, 2026, six days after the 2026 federal general election.

## VII. Impact on the 2026 Midterms and Future Elections

145. DOD's emergency changes to the FPCA will harm the DNC and its members and supporters by altering the rules for the elections in which the DNC and its members compete, undermining the DNC and its members' ability to participate in lawful and fair elections,

burdening and likely disenfranchising DNC members and other voters who support Democratic candidates, harming the DNC's electoral prospects, and forcing the DNC to divert money and resources to ameliorate the emergency changes' effects.

146. By modifying the FPCA less than ninety days before the 2026 midterm elections and mere weeks before UOCAVA and state laws required ballots to be mailed to uniformed servicemembers and U.S. citizens overseas, DOD amplified these injuries.

147. DOD's emergency changes to the FPCA threaten to disrupt and confuse ongoing election activities. The FPCA's emergency changes apply immediately. Contradictory guidance offered weeks after issuance of the revised FPCA will only further confuse Democratic voters and the state and local election officials who might assist them.

148. A "bedrock tenet of election law" is that "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring in the grant of a stay pending appeal); *see also People Not Politicians*, 2026 WL 2883222, at *2; *USPS*, 2026 WL 2687160, at *1. Last-minute changes may "work[] a needlessly chaotic and disruptive effect upon the electoral process." *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (citation modified). This is precisely the effect the emergency change to the FPCA will have on the DNC and its members and supporters in the midst of an active general election.

**A. Direct Harm to the DNC**

149. Emergency changes to the FPCA harm the DNC directly by forcing candidates supported by the DNC to compete in unlawfully structured elections.

150. "[C]andidates . . . have an interest in a fair process" and "suffer [a cognizable harm] when the process departs from the law." *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519–20 (2026). Even candidates who ultimately prevail suffer a concrete injury when laws "erode[] public confidence that the election results reflect the people's will." *Id.* at 520.

151. In turn, "[p]olitical parties . . . occupy a unique position with a special relationship and unity of interest with candidates." *Nat'l Republican Senatorial Comm. v. FEC*, 146 S. Ct. 2404, 2425 (2026) (citation modified); *see id.* at 2418 (describing "the thoroughly intertwined relationship of parties and their candidates").

152. The FPCA's emergency changes effectively alter the registration rules in ways that deprive "candidate[s] of a fair process and an accurate result." *Bost*, 146 S. Ct. at 520. That concrete injury is compounded by the damage to the DNC's reputational interests, which depend on public confidence in free and fair elections.

**B. Harm to DNC Members**

153. Emergency changes to the FPCA also harm the DNC's members, which include registered Democrats and Democratic voters, by making it difficult—if not impossible—for those individuals who are U.S. citizens born and remaining abroad to register to vote and request mail ballots. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008); *LULAC v. EOP*, 808 F. Supp. 3d 29, 60–61 (D.D.C. 2025).

154. U.S. citizens born and remaining abroad are more likely to be Democrats than Republicans.

155. Many of the DNC's members who are U.S. citizens born and remaining abroad have used the FPCA to register to vote and request mail ballots.

156. By eliminating the third checkbox for civilians abroad, the modified FPCA imposes material burdens on the ability of DNC members to register and request mail ballots and will disenfranchise some DNC members.

157. This harm extends to DNC members who are U.S. citizens born and remaining abroad and who are currently registered voters. These voters must still request mail ballots on an

annual basis, a requirement that becomes more difficult and, in some cases, impossible under the modified FPCA.

158. Upon information and belief, some U.S. citizens born and remaining abroad who successfully completed the FPCA prior to approval of the August 26 Emergency ICR will be deterred from casting a ballot due to questions regarding their eligibility raised by changes to the FPCA, alongside removal of FVAP voting guidance these voters have relied on for years.

159. Upon information and belief, some U.S. citizens born and remaining abroad who could lawfully use state voter registration forms and mail ballot applications to register and request a ballot overseas will be deterred from doing so due to questions regarding their eligibility raised by changes to the FPCA, alongside removal of FVAP voting guidance these voters have relied on for years.

**C. Competitive Harm**

160. Emergency changes to the FPCA harm the DNC by burdening, deterring, and potentially disenfranchising predominantly Democratic-leaning voters. When fewer Democratic-leaning voters are able to vote, the electoral prospects of Democratic campaigns necessarily suffer. *See Crawford*, 472 F.3d at 951.

161. This injury to the electoral prospects of Democratic candidates and campaigns is cognizable under Article III. *See, e.g.*, *Shays v. FEC*, 414 F.3d 76, 85–86 (D.C. Cir. 2005); *LULAC*, 808 F. Supp. 3d at 61.

162. Indeed, this is an express aim of the RNC's spate of litigation challenging state laws establishing that U.S. citizens born and remaining abroad are eligible voters. *See, e.g.*, Complaint ¶ 31, *Republican National Comm. v. Va. State Bd. of Elections*, No. CL26002003-00 (Va. Cir. Ct. Apr. 6, 2026) ("[T]hese ongoing registration practices place the RNC at a competitive

disadvantage compared to its Democratic counterpart because never-resident voters largely favor Democratic candidates.”).

163. Disenfranchising voters likely to support Democratic candidates also appears to be an aim of DOD’s “emergency” actions.

## CAUSE OF ACTION

### Count I: Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (DOD)

164. The DNC realleges and incorporates by reference the allegations set forth above.

165. The APA entitles “a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review.” 5 U.S.C. § 702.

166. The APA directs courts to hold unlawful and set aside agency actions that are found to be “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” *Id.* § 706(2)(A).

167. DOD’s “emergency” revisions to the FPCA are a “final agency action for which there is no other adequate remedy in a court” within the meaning of the APA. *Id.* § 704.

168. DOD requested “emergency processing” of its proposed revisions to the FPCA in the absence of an “emergency” within the meaning of the PRA and applicable regulations. 44 U.S.C. § 3507(j); 5 C.F.R. § 1320.13.

169. DOD disregarded the historical use of notice and comment to facilitate reasoned revisions to the FPCA by claiming the eligibility category labeled “I am a U.S. citizen living outside the country, and I have never lived in the United States” recently came to its attention, notwithstanding longstanding inclusion of this category on the form.

170. DOD failed to engage in reasoned decision-making before excluding a category of eligible U.S. citizens residing overseas from using the FPCA.

171. DOD failed to consider the reliance interests of U.S. citizens born and remaining abroad who are eligible to vote, state officials, and local election administrators when removing an eligibility category from the FPCA.

172. DOD failed to provide an adequate explanation for why eligible U.S. citizens born and remaining abroad should no longer be allowed to use the FPCA and should be impeded from exercising the right to vote.

173. DOD's actions, as alleged herein, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of § 706 of the APA.

**Count II: Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (OMB)**

174. The DNC realleges and incorporates by reference the allegations set forth above.

175. The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review." 5 U.S.C. § 702.

176. The APA directs courts to hold unlawful and set aside agency actions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

177. OMB's approval of DOD's August 26 Emergency ICR is a "final agency action for which there is no other adequate remedy in a court," within the meaning of the APA. *Id.* § 704.

178. DOD's August 26 Emergency ICR contains a "collections of information" subject to the substantive and procedural requirements of the PRA. 44 U.S.C. § 3507(a).

179. DOD's proposed revisions to the FPCA were not contained in a "proposed rule," within the meaning of the PRA. *Id.* § 3507(d).

180. OMB approved the August 26 Emergency ICR in the absence of an "emergency," within the meaning of the PRA and applicable regulations. *Id.* § 3507(j); 5 C.F.R. § 1320.13.

181. OMB approved DOD's August 26 Emergency ICR despite DOD's failure to take all practicable steps to consult with interested agencies and members of the public. 5 C.F.R. § 1320.13(c)

182. OMB approved DOD's August 26 Emergency ICR despite DOD's failure to provide requisite notice in the Federal Register. *Id.* § 1320.13(d).

183. OMB's actions, as alleged herein, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of § 706 of the APA.

**PRAYER FOR RELIEF**

WHEREFORE, the DNC requests that this Court:

A. Declare that DOD acted unlawfully by revising the FPCA without complying with the APA;

B. Declare that DOD's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

C. Set aside DOD's modification of the FPCA pursuant to the August 26 Emergency ICR;

D. Declare that OMB acted unlawfully by approving DOD's August 26 Emergency ICR without complying with the APA;

E. Declare that OMB's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

F. Set aside OMB's August 28 approval of the August 26 Emergency ICR;

G. Enjoin DOD from continuing to issue the August 2026 version of the FPCA;

H. Enjoin DOD to reissue the January 2023 version of the FPCA and associated guidance;

I. Award the DNC its costs, attorneys' fees, and other disbursements for this action; and

J. Grant any other relief this Court deems appropriate.

Dated: October 1, 2026

Respectfully submitted,

*/s/ Daniel J. Freeman*
Daniel J. Freeman (D.C. Bar No. 90038422)
**DEMOCRATIC NATIONAL COMMITTEE**
430 South Capitol Street SE
Washington, D.C. 20003
(202) 863-8000
freemand@dnc.org

*Counsel for the Democratic National Committee*

Kevin J. Hamilton (Wash. Bar. No. 15648)*
Jonathan P. Hawley (D.C. Bar No. 1782101)*
**ASHURST PERKINS COIE US LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
(206) 359-8000
Kevin.Hamilton@ashurstperkins.com
Jonathan.Hawley@ashurstperkins.com

John Patrick Bailey (D.C. Bar No. 1620277)*
**ASHURST PERKINS COIE US LLP**
700 13th Street NW, Suite 800
Washington, D.C. 20005
(202) 654-6200
John.Bailey@ashurstperkins.com

**Pro hac vice application forthcoming*